IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00779-PAB-NYW

CAROL TOREN-EDMISTON,

    Plaintiff,

v.

WELLS FARGO & COMPANY, and
WELLS FARGO BANK N.A.,

    Defendants.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Magistrate Judge Nina Y. Wang

This matter comes before the court for recommendation on Plaintiff Carol Toren-Edmiston's ("Plaintiff" or "Ms. Toren-Edmiston) Motion for Leave to Amend and Supplement the Pleadings (the "Motion to Amend" or "Motion"), filed August 14, 2019. [#65]. The undersigned Magistrate Judge considers the Motion pursuant to 28 U.S.C. § 636(b) and the Memorandum dated August 14, 2019 [#66]. This court concludes that oral argument will not materially assist in the resolution of this matter. Accordingly, having reviewed the Motion and associated briefing, the applicable case law, and being otherwise advised in its premise, this court respectfully **RECOMMENDS** that the Motion to Amend be **DENIED**.

### BACKGROUND

This civil action arises out of an employment dispute between Ms. Toren-Edmiston and Defendants Wells Fargo & Company and Wells Fargo Bank N.A. (collectively, "Wells Fargo" or "Defendants"). *See* [#26 at ¶¶ 1-5]. Plaintiff began her employment in or around 1985 with one of Wells Fargo's predecessors as a Regulatory Reporting Specialist; she held several different

positions with Wells Fargo and its predecessors and received several promotions along the way, including as manager of the Non-Performing Home Equity Portfolio—"a portfolio that held $11.8 billion in equity." *See* [*id.* at ¶¶ 12-19]. In 2008, Ms. Toren-Edmiston left Wells Fargo for a position with CitiMortgage, Inc., where she again received several promotions and held leadership roles, before returning to Wells Fargo as the Head of Centralized Mortgage Retail in 2013. *See* [*id.* at ¶¶ 23-26]. Upon returning to Wells Fargo, Plaintiff oversaw 600 employees and led several of Wells Fargo's departments. *See* [*id.* at ¶¶ 27-31].

Valuing risk management, which Wells Fargo defines as "business risks includ[ing] but [] not limited to credit, market, operational, regulatory compliance, strategic, and reputation risks," [#77-1 at 62], "Ms. Toren-Edmiston created the Raise Your Hand Mailbox for the specific purpose of addressing risk management issues from all levels throughout the organization," [#26 at ¶¶ 46-47]. "While previous supervisors saw Ms. Toren-Edmiston's willingness to speak up as a strength for the company, her supervisor Liz Bryant and those to whom Ms. Bryant reported viewed it as a liability." [*Id.* at ¶ 50]. For instance, following Ms. Toren-Edmiston's attempts (which were successful) to implement new compensation metrics to replace the "customer loyalty metric" that Ms. Toren-Edmiston believed "created incentives for loan officers to engage in questionable behavior in order to obtain larger bonuses," Ms. Bryant issued Plaintiff negative feedback and instructed Plaintiff to terminate the Raise Your Hand Mailbox. *See* [*id.* at ¶¶ 51-59].

Ms. Toren-Edmiston's additional suggestions for improving risk management went unheeded, and thus she began the process for retirement in or about December 2017. *See* [*id.* at ¶¶ 61-79; #77-1 at 194-95]. Ms. Toren-Edmiston worked with Wells Fargo's Retirement Service Center over the next several months; however, Wells Fargo terminated Plaintiff via phone call with Ms. Bryant on February 5, 2018, despite positive performance reviews from 2015 and 2016.

2

*See* [#26 at ¶¶ 79-99, 100-106; #65-1 at ¶ 2]. According to Ms. Toren-Edmiston, Ms. Bryant criticized Plaintiff's management of risk in her own departments, "accused Ms. Toren-Edmiston of alleged misconduct regarding the Raise Your Hand Mailbox," and refused Ms. Toren-Edmiston's request to retire rather than be terminated. *See* [#26 at ¶¶ 86-99, 125; #65-1 at ¶ 4].

Ms. Toren-Edmiston contends that Wells Fargo never provided her with a reason for her termination, that is until August 2019 when Wells Fargo informed Plaintiff that she had violated its Risk Management and Accountability policy and Code of Ethics and Business Conduct by creating the Raise Your Hand Mailbox. *See* [#26 at ¶ 99; #65-1 at ¶¶ 4-16]. Ms. Toren-Edmiston unsuccessfully challenged her termination internally with Wells Fargo, *see* [#76-2; #76-3; #77-2], and despite demands for her roughly $500,000 of earned yet unpaid bonuses and stock options ("RSRs"), Wells Fargo refused to pay Plaintiff any bonuses or RSRs for 2017 following her termination. *See* [#26 at ¶¶ 107-24, 127-28; #65-1 at ¶¶ 9-12; #76-2].

Plaintiff then initiated this civil action on or about February 18, 2019, by filing her Complaint in the Boulder County District Court, asserting claims against Defendants for wrongful discharge in violation of public policy ("wrongful discharge"), promissory estoppel, unjust enrichment, and violations of the Colorado Wage Claim Act, Colo. Rev. Stat. § 8-4-109. *See generally* [#1; #3]. Defendants removed this civil action to this District pursuant to 28 U.S.C. § 1332 on March 15, 2019. *See* [#1].

In response to Defendants' Motion to Dismiss Plaintiff's wrongful discharge, promissory estoppel, and unjust enrichment claims, Ms. Toren-Edmiston filed her operative First Amended Complaint on April 30, 2019. [#26]. Her First Amended Complaint asserts claims against Defendants for wrongful discharge, promissory estoppel, unjust enrichment, interference with benefits in violation of the Employment Retirement Income Security Act of 1974 ("ERISA")

3

(pleaded in the alternative pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure), and willful withholding of wages in violation of the Colorado Wage Claim Act. *See generally* [*id.*]. Defendants have since moved to dismiss the First Amended Complaint in its entirety, which remains pending before the presiding judge, the Honorable Philip A. Brimmer. *See* [#49].

Relevant here, this court conducted a Scheduling Conference on May 14, 2019, at which the undersigned set June 14, 2019 as the amendment of pleadings deadline and November 22, 2019 as the discovery cut-off. *See* [#32 at 9]. Now, Plaintiff moves to amend her First Amended Complaint to "amend and supplement the pleadings to add a claim for breach of the duty of good faith and fair dealing" (pleaded in the alternative) concerning Defendants' withholding of Ms. Toren-Edmiston's 2017 bonuses and RSRs. *See* [#65]. Defendants oppose the Motion, arguing Plaintiff knew the basis for her breach of the duty of good faith and fair dealing claim prior to the amendment of pleadings deadline, the newly pleaded allegations are immaterial to her proposed claim, and amendment is futile. *See* [#76]. Plaintiff has since replied, *see* [#77], and thus the Motion to Amend is ripe for recommendation. I consider the Parties' arguments below.

## LEGAL STANDARD

As courts in this District have repeatedly observed, a "Scheduling Order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *E.g.*, *Lehman Bros. Holdings Inc. v. Universal Am. Mortg. Co.*, LLC, 300 F.R.D. 678, 681 (D. Colo. 2014). Indeed, a Scheduling Order is an important tool used for the orderly preparation of a case for trial and to avoid surprise to the parties and to the court. *Id.* Accordingly, Rule 16(b)(4) of the Federal Rules of Civil Procedure expressly provides that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The Scheduling Order expressly reflects this principle. [#21 at 8].

The purpose of the deadline to amend pleadings and join parties, as set out in a Scheduling Order, is to force the parties to prioritize their discovery to obtain the information necessary to know if amendment is required sooner rather than later. This also ensures that discovery proceeds in an orderly fashion. *See Valles v. Gen-X Echo B, Inc.*, Civil Action No. 13-cv-00201-RM-KLM, 2013 WL 5832782, *3 (D. Colo. Sept. 27, 2013). Accordingly, when a party seeks to amend pleadings after the deadline set in the Scheduling Order, the court's consideration is subject to a two-prong analysis. First, the party must establish good cause under Rule 16(b)(4) of the Federal Rules of Civil Procedure. *See Gorsuch, Ltd., B.D. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014). Only if the party establishes good cause does the court turn to whether amendment is proper under Rule 15(a) of the Federal Rules of Civil Procedure. *Id.* at 1242; *Pumpco, Inc. v. Schenker Int'l, Inc.*, 204 F.R.D. 667, 668 (D. Colo. 2001).

## ANALYSIS

Because this court concludes Ms. Toren-Edmiston fails to demonstrate good cause under Rule 16(b), I limit my analysis to this first step. Rule 16(b) provides that a scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "In practice, this standard requires the movant to show the 'scheduling deadlines cannot be met despite [the movant's] diligent efforts.'" *Gorsuch,* 771 F.3d at 1240 (citing *Pumpco*, *Inc.*, 204 F.R.D. at 668). This burden is satisfied, for example, when a party learns of new information in a deposition or if the governing law has changed. *Id.* "Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party. Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment." *Colo. Visionary Acad. v. Medtronic, Inc.,* 194 F.R.D. 684, 687 (D. Colo. 2000).

Plaintiff avers she first learned that Defendants terminated her for purported violations of Wells Fargo's Risk Management and Accountability policy and the Code of Ethics and Business Conduct on August 2, 2019. *See* [#65 at 3-4; #65-2 at 3; #77 at 5-6]. She contends that prior to this date Wells Fargo never provided her with a <u>specific</u> violation of its policies that justified her termination, despite her attempts to discern this information, and stated only that the Raise Your Hand Mailbox was a policy violation. *See* [#65 at 4-5; #65-1 at ¶¶ 2, 4, 7-8, 13-16; #65-2 at 3; #77-2]. Ms. Toren-Edmiston believes Wells Fargo's newly proffered reason for her termination is "a pretextual basis to deny her the incentive compensation she is owed." [#65 at 4].

Defendants counter that Ms. Toren-Edmiston had all the information relevant to her breach of the duty of good faith and fair dealing claim well before the June 14, 2019 amendment of pleadings deadline. *See* [#76 at 2-3]. For instance, on May 15, 2019, Defendants produced a document of draft talking points concerning the February 5, 2018 phone call between Ms. Bryant and Ms. Toren-Edmiston, which states, in pertinent part, "your failure to provide strong and appropriate risk management leadership and risk management oversight has also not been at an acceptable level. Your poor leadership in this regard violates our company's Risk Management and Accountability policy." [#64-1 at 3]. In addition, on May 29, 2019, Defendants produced its RSRs and bonus plans—documents Ms. Toren-Edmiston signed and agreed to—that explicitly conditioned receipt of benefits on adherence to Wells Fargo's policies and procedures as well as its communications regarding Plaintiff's termination and the withholding of her RSRs and bonuses. *See* [#65-3; #65-4; #76-1; #76-2; #76-3]. According to Wells Fargo, "Plaintiff cannot accurately claim that she first learned of these facts [i.e., the reasons for her termination and withholding of her RSRs and bonuses] on August 2, 2019." [#76 at 6]. For the following reasons, I respectfully agree with Wells Fargo.

To the extent Ms. Toren-Edmiston knew of the conduct giving rise to her breach of the duty of good faith and fair dealing claim prior to the June 14, 2019 amendment of pleadings deadline, she cannot now establish good cause under Rule 16(b)(4) to amend the Scheduling Order. *See Husky Ventures, Inc. v. B55 Investments, Ltd.*, 911 F.3d 1000, 1020 (10th Cir. 2018) ("Because Rule 16 requires diligence, B55 and Mr. McArthur cannot establish good cause if B55 knew of the underlying conduct but simply failed to raise [its] claims." (internal quotation marks omitted)). Ms. Toren-Edmiston does not deny that Defendants produced the above documents prior to the June 14, 2019 amendment of pleadings deadline. She does, however, contest Defendants' assertions that these documents made clear that Wells Fargo terminated her for violating its Risk Management and Accountability policy and the Code of Ethics and Business Conduct. *See* [#77 at 5-6]. While the documents produced are less than clear as to the specific policy violations resulting in Plaintiff's termination, *see, e.g.*, [#64-1 at 3; #65-6; #76-2 at 3; #76-3], I conclude that Ms. Toren-Edmiston knew of the conduct giving rise to her breach of the duty of good faith and fair dealing claim <u>prior</u> to the June 14, 2019 amendment of pleadings deadline, and the identification of the specific violations does not affect this conclusion.

Pursuant to Wells Fargo's Long-Term Incentive Compensation Plan Restricted Share Rights Award Agreement (the "RSRs Agreement"), "any then unvested Restricted Share Right awarded hereby . . . will immediately terminate without notice to you and will be forfeited" upon an employee's termination for reasons not covered by the RSRs Agreement. *See* [#65-3 at 2]. The RSRs Agreement also defines "cause" to include, *inter alia*, "violation of the Company's policies, including but not limited to Wells Fargo's Code of Ethics and Business Conduct (or the Code applicable to your line of business), Anti-Bribery and Corruption Policy, Information Security Policies, and Risk Management Accountability Policy." [*Id.* at 8]. Likewise, Wells Fargo's

Incentive Compensation Plan for Senior Production Managers (the "Incentive Compensation Plan") conditions a receipt of compensation on following Wells Fargo's "procedures, policies, processes and guidelines applicable to the [employee's] role[.]" [#65-4 at 1]. To the extent an employee fails to satisfy this requirement due to "Misconduct," meaning "a serious violation of Wells Fargo policy" such as its Code of Ethics and Business conduct and Risk Management Accountability policy, the employee "will be ineligible to earn the compensation set forth in this Plan" and may be subject to termination. *See* [*id.* at 1-2].

Based on the plain language of the RSRs Agreement and Incentive Compensation Plan, this court agrees with Defendants that a violation of <u>any</u> of Wells Fargo's policies may justify the withholding of RSRs or bonuses. *See Leprino Foods Co. v. Factory Mut. Ins. Co.*, 653 F.3d 1121, 1127 (10th Cir. 2011) (explaining that in interpreting contracts under Colorado law "the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words used." (internal quotation marks omitted)). While Ms. Toren-Edmiston attests that Wells Fargo did not inform her of the reason(s) for her termination at the time, Plaintiff asserts she learned that Defendants terminated her for a violation of its policies in or about April 2018. *See* [#65-1 at ¶¶ 13-14; #76-2; #76-3; #77-2]. Further, Ms. Toren-Edmiston does not refute Defendants' assertions that she signed and agreed to the RSRs Agreement and Incentive Compensation Plan during her employment with Wells Fargo or that Defendants produced these documents well before the June 14, 2019 amendment of pleadings deadline.

At bottom, Ms. Toren-Edmiston's breach of the duty of good faith and fair dealing claim rests on her continued beliefs that she never violated a Wells Fargo policy prior to her termination and so Defendants' assertions to the contrary are mere pretext for the wrongful withholding of her

RSRs and bonuses. *See* [#65-7 at ¶¶ 100-07, 130, 210-23]. But this theme has been present since the inception of Ms. Toren-Edmiston's case and underlies her asserted claims for promissory estoppel, unjust enrichment, and violations of ERISA and the Colorado Wage Claim Act. *See generally* [#26]. Indeed, it is clear from the First Amended Complaint—particularly the allegations underlying her claims for wrongful discharge and promissory estoppel—that Ms. Toren-Edmiston believed that any basis for her termination (whether expressly articulated or not) and the failure to pay her RSRs and bonuses, including but not limited to accusations of misconduct associated with the Raise Your Hand Mailbox, was pretextual given her strong prior performance. *See, e.g.*, [*id.* at ¶¶ 49, 86-88, 95-97, 126, 149-169]. Accordingly, her ability to plead a claim for the breach of the duty of good faith and fair dealing was not dependent, nor triggered, by the particular grounds articulated for withholding her RSRs and bonuses.

Based on the foregoing, I conclude that it is immaterial whether Plaintiff learned of the specific violations on August 2, 2019, as she possessed information relevant to her breach of the duty of good faith and fair dealing claim <u>prior</u> to the June 14, 2019 amendment of pleadings deadline. For this reason, I conclude Ms. Toren-Edmiston fails to demonstrate good cause to amend the Scheduling Order under Rule 16(b)(4) and respectfully **RECOMMEND** that the Motion to Amend be **DENIED**. *See Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1248-49 (10th Cir. 2015) ("Because Appellants knew of the underlying conduct but simply failed to raise their claims, they cannot establish good cause under Rule 16. As a result, there is no need to consider whether Appellants satisfied Rule 15." (internal brackets, citation, footnote, and quotation marks omitted)).

## CONCLUSION

For the reasons stated herein, this court respectfully **RECOMMENDS** that:

(1) Plaintiff's Motion to Amend [#65] be **DENIED**.[1]

DATED: November 4, 2019

BY THE COURT:

Nina Y. Wang
United States Magistrate Judge

---

[1] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).